**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE OPENAI, INC. COPYRIGHT INFRINGEMENT LITIGATION | MDL No. 3143 |

**<u>REPLY BRIEF IN SUPPORT OF OPENAI'S MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS</u>**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .........................................................................................................5

    A.    Common and complex questions of fact and law exist across the cases. ................5

    B.    Centralization will serve the convenience of the parties and witnesses and
        promote the just and efficient conduct of the litigation. .......................................10

        1.    Alternatives to centralization have not succeeded. ....................................10

        2.    Centralization will avoid inconsistent rulings.............................................13

        3.    The time for centralization is now. ............................................................14

    C.    The Class Plaintiffs' procedural history arguments are legally irrelevant
        and factually inaccurate. ......................................................................................16

    D.    The cases should be centralized in the Northern District of California.................19

III.  CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re: Am. Home Realty Network, Inc., Multiple Listing Serv. Copyright*
    *Infringement Litig.*,
    939 F. Supp. 2d 1372 (J.P.M.L. 2013) ................................................................7, 17

*Authors Guild et al. v. OpenAI, Inc. et al.*,
    1:23-cv-08292 (S.D.N.Y.) ........................................................................... *passim*

*In re Auto Body Shop Antitrust Litig.*,
    37 F. Supp. 3d 1388 (J.P.M.L. 2014) ...........................................................................9

*Daily News, LP et al. v. Microsoft et al.*,
    1:24-cv-03285 (S.D.N.Y.) .......................................................................................1

*In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Prac., and Prod. Liab.*
    *Litig.*,
    412 F. Supp. 3d 1357 (J.P.M.L. 2019) .........................................................................5

*In re Gator Corp. Software Trademark & Copyright Litig.*,
    259 F. Supp. 2d 1378 (J.P.M.L. 2003) .............................................................7, 12, 13

*In re: Glaceau VitaminWater Mktg. & Sales Prac. Litig. (No. II)*,
    764 F. Supp. 2d 1349 (J.P.M.L. 2011) .......................................................................17

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021) ...................................................................................................8

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*
    363 F. Supp. 3d 1372 (J.P.M.L. 2019) .................................................................2, 5, 18

*In re Midwest Energy Emissions Corp. Pat. Litig.*,
    2024 WL 5114663 (J.P.M.L. 2024) .............................................................................5

*Millette et al. v. OpenAI*,
    5:24-cv-04710 (N.D. Cal.) ........................................................................... *passim*

*In re OpenAI ChatGPT*,
    3:23-cv-03223 (N.D. Cal.) ...................................................................................1, 17

*In re Plumbing Fixtures*,
    308 F. Supp. 242 (J.P.M.L. 1970) ...........................................................................4, 14

*Raw Story Media, Inc. et al. v. OpenAI*,
    1:24-cv-01514 (S.D.N.Y.) ........................................................................... *passim*

*In re Republic Nat'l-Realty Equities Sec. Litig.*,
    382 F. Supp. 1403 (J.P.M.L. 1974)........................................................................14

*The Center for Investigative Reporting v. OpenAI, Inc. et al.*,
    1:24-cv-04872 (S.D.N.Y.) ..........................................................................1, 8, 18

*The Intercept Media, Inc. v. OpenAI et al.*,
    1:24-cv-01515 (S.D.N.Y.) ................................................................... *passim*

*The New York Times v. Microsoft et al.*,
    1:23-cv-11195 (S.D.N.Y.) ................................................................................1

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    2017 WL 4680242 (N.D. Cal. Oct. 18, 2017).......................................................11

**Federal Statutes**

17 U.S.C. § 411 .......................................................................................................9

17 U.S.C. § 1202 ......................................................................................................9

17 U.S.C. § 1202(b) ................................................................................................10

28 U.S.C. § 1407 ............................................................................................. *passim*

Copyright Act § 501................................................................................................9

**Rules**

Rule 30(b)(6)..........................................................................................................15

## I.    INTRODUCTION

OpenAI's motion and plaintiffs' responses make clear that centralization is necessary and appropriate. Centralization will eliminate duplicative discovery and prevent inconsistent pretrial rulings on complex and novel legal questions presented by recent breakthroughs in artificial intelligence. These includes questions of first impression regarding fair use that are likely to be presented at summary judgment, as well as class certification questions involving overlapping and duplicative putative classes. Centralization will also conserve the resources of the parties, their counsel, and the judiciary, and ensure that the 12 actions that OpenAI seeks to centralize—which are likely to have profound consequences for OpenAI and its technology for years to come—are resolved justly and efficiently.

The responses to OpenAI's motion filed by plaintiffs and Microsoft Corporation ("Microsoft") confirm that centralization is warranted. Microsoft, OpenAI's co-defendant in six of the 12 actions, supports OpenAI's request for relief, as did the plaintiffs in *Millette.*[1] The remaining plaintiffs filed four separate briefs in opposition: one from the plaintiffs in *Raw Story*[2] and *Intercept*[3] (the "DMCA Cases"), MDL Dkt. 51; one from the plaintiffs in *The New York Times*[4], *Daily News*[5], and *The Center for Investigative Reporting*[6] (the "News Cases"), MDL Dkt. 57; one from the plaintiffs in *Authors Guild*[7] (the "New York Class Action"), MDL Dkt. 59; and one from the plaintiffs in *In re ChatGPT*[8] (the "California Class Action"), MDL Dkt. 58 (collectively, the "Opposing Plaintiffs"). Opposing Plaintiffs' briefs do not engage effectively

---

[1] *Millette et al. v. OpenAI*, 5:24-cv-04710 (N.D. Cal.) ("*Millette*")

[2] *Raw Story Media, Inc. et al. v. OpenAI*, 1:24-cv-01514 (S.D.N.Y.) ("*Raw Story*")

[3] *The Intercept Media, Inc. v. OpenAI et al.*, 1:24-cv-01515 (S.D.N.Y.) ("*Intercept*")

[4] *The New York Times v. Microsoft et al.*, 1:23-cv-11195 (S.D.N.Y.) ("*The New York Times*")

[5] *Daily News, LP et al. v. Microsoft et al.*, 1:24-cv-03285 (S.D.N.Y.) ("*Daily News")*

[6] *The Center for Investigative Reporting v. OpenAI, Inc. et al.*, 1:24-cv-04872 (S.D.N.Y.) ("*The Center for Investigative Reporting*")

[7] *Authors Guild et al. v. OpenAI, Inc. et al.*, 1:23-cv-08292 (S.D.N.Y.) (the "*Authors' Guild*")

[8] *In re OpenAI ChatGPT*, 3:23-cv-03223 (N.D. Cal.) ("*In re ChatGPT*")

with the standard for centralization and fail to show why centralization is not necessary, resorting to baseless blame-shifting, and irrelevant, inconsistent, and otherwise inaccurate arguments.

*First*, the Opposing Plaintiffs argue that there is insufficient factual overlap to justify centralization, attempting to draw thin distinctions between the News Cases, the Class Actions, and the DMCA Cases. But even the California Class Plaintiffs concede that virtually all of these actions are "based on OpenAI's training on literary works." MDL Dkt. 58 at 7. In fact, they all are.[9] The factual and legal questions regarding the extent to which OpenAI's conduct constitutes copyright infringement or fair use is *the* central question across all cases. When cases arise from such a "common factual core," plaintiffs' "differing legal theories [are] not significant" to a motion for transfer. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.* 363 F. Supp. 3d 1372, 1374 (J.P.M.L. 2019). And "Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer," rendering any minor variation in claims pleaded, facts alleged, or the specific nature of asserted works immaterial to this motion. *Id.*

Moreover, the purported differences between the plaintiffs' claims are belied by their own litigation conduct: in virtually every instance where an Opposing Plaintiff insists that a certain factual or legal matter is not "at issue" in a given case, their discovery requests reveal that the Opposing Plaintiff has, in fact, put that matter at issue. Plaintiffs in the Class cases have also demanded cross-production of documents from the News cases, and vice versa, expressly conceding the similarity of their claims. Declaration of Michelle Ybarra in support of OpenAI's Reply in support of Motion for Transfer ("Ybarra Decl.") ¶ 3–5. Indeed, over 90% of documents produced by OpenAI have been produced in the California and New York Class Actions and the News cases. Ybarra Decl. ¶ 16. Plaintiffs' assertion that there is insufficient factual overlap to warrant consolidation is therefore unsupported both by Plaintiffs' conduct and the similarities in the productions themselves.

---

[9] As explained below, the California Class Plaintiffs' view that only the *Millette* case is *not* based on such training is incorrect and based on a misreading of that complaint.

*Second*, the Opposing Plaintiffs argue that OpenAI's motion is both *premature*—insisting that informal coordination can still be achieved—and *too late*—arguing that it should have been filed nearly a year ago, before half of the cases that OpenAI seeks to centralize were even filed. These flatly contradictory arguments reveal the truth behind the Opposing Plaintiffs' positions: there is no point at which the Opposing Plaintiffs would have found the timing of OpenAI's motion appropriate, and they have been actively avoiding coordination by insisting for several months that informal coordination could be achieved while making none of the concessions that coordination actually requires. This is because the Opposing Plaintiffs have thus far only *benefited* from the duplicative discovery required of OpenAI and Microsoft, while the burdens of that duplicative discovery fall exclusively on the parties providing it.

It is not surprising then that informal coordination has proven unsuccessful despite several months of extensive negotiations. Indeed, the California Class Plaintiffs have conceded that discovery coordination efforts have not "borne fruit" after months of the parties' "best efforts" at coordination, *In re ChatGPT*, Dkt. 244. The Panel should not heed the Opposing Plaintiffs' calls for more time. The parties'—and the courts'—efforts to consolidate and coordinate the disparate plaintiffs and interests presented by these cases have reached their limit. The time has come to meaningfully coordinate these actions in a single venue to ensure the just and efficient conduct of the litigation.

Nor should the Panel give credence to the Opposing Plaintiffs' insistence that OpenAI's motion is too late. That argument is belied by the same plaintiffs' simultaneous insistence that the motion is premature. Moreover, their contentions about the cases' different procedural postures are vastly overstated. All three News Cases, the New York Class Action, and the California Class Action—which represent 9 of the 12 cases, and all the cases in which discovery has been most active and not stayed—are in *identical* postures, with fact discovery currently set to end in April 2025. The DMCA Cases and *Millette*'s procedural postures vary only modestly and could be easily put on the same track with appropriate coordination orders. Indeed, OpenAI has already agreed to cross-produce all documents among the DMCA cases—in addition to

extensive cross-productions from other cases—which will put those cases in identical positions with regard to discovery. And there is still much work to do. No depositions have been taken in any case as of this filing, expert discovery is unlikely to begin for many months, and no summary judgment or class certification motions have been filed. Centralization and coordination of each of these processes will benefit the parties, witnesses, and the courts.

*Third*, the Opposing Plaintiffs do not even attempt to address the serious concerns about inconsistent rulings affecting overlapping classes, despite this risk being among the most compelling bases for centralization. *See, e.g.*, *In re Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L. 1970). Nor do the Opposing Plaintiffs seriously contest that these cases present a risk of other inconsistent pretrial rulings; they merely argue that the clearest example of such inconsistent rulings—the conflicting orders on the motions to dismiss in *Raw Story* and *Intercept*—can be reconciled. They are wrong. Even a cursory look at the orders confirms that the legal conclusions are irreconcilable and cannot be attributed to differences in alleged facts. Such fractures will only grow as more factually and legally complex questions are presented to the five judges overseeing these cases in motions for summary judgment and class certification.

*Finally*, OpenAI, the *Millette* Plaintiffs, and the California Class Plaintiffs all agree that, should centralization be ordered, the Northern District of California is the most appropriate forum. Even Microsoft—which is not a defendant in any case filed in the Northern District of California—does not object to transfer there, so long as the case is assigned to a judge with prior MDL experience. Only the News Plaintiffs, the DMCA Plaintiffs, and the New York Class Plaintiffs prefer the Southern District of New York, for no apparent reason other than that their cases were filed there. But these parties do not—and cannot—contest that the Northern District of California is home to the majority of witnesses, is the locus of the core conduct underlying each complaint, and has a strong track record for efficient case management, time-to-trial, and motion resolution. All of these factors establish the Northern District of California as the superior transferee forum.

In short, the Opposing Plaintiffs fail to rebut any of the compelling reasons for centralization that OpenAI set out in its motion. Because Section 1407 centralization would further the purposes of the statute by ensuring the just and efficient resolution of these actions, the Panel should grant OpenAI's motion and transfer the cases in Schedule A to the Northern District of California.

## II.    ARGUMENT

### A.    Common and complex questions of fact and law exist across the cases.

Though the Opposing Plaintiffs grasp at thin distinctions between the cases that OpenAI seeks to centralize, none of them contests that each case arises from the same core allegations related to OpenAI's alleged practices of training its LLMs on copyrighted material. As OpenAI sets forth in its motion, these core—and complex—allegations exist in every case and present a strong basis for centralization. *See* MDL Dkt. 1-1 at 12–13. The extensive overlap in the plaintiffs' claims and allegations is confirmed by the Opposing Plaintiffs' demands for cross-production from other cases. For example, the New York Class Plaintiffs recently requested "that OpenAI produce the files of…four custodians that it has produced in the News Cases…and/or [the California Class Action]" because "[t]hese custodians are likely to have relevant, non-duplicative information." Ybarra Decl. ¶ 3. Similarly, The Intercept has taken the position that OpenAI "should cross produce from the [News Cases], not just Raw Story." *Id.* ¶ 4. And the California Class Plaintiffs have sought "responsive materials that were produced in other litigation (***particularly ones raising remarkably similar claims with overlapping allegations***)." *Id.* ¶ 5 (emphasis added).

At any rate, centralization under Section 1407 "does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Midwest Energy Emissions Corp. Pat. Litig.*, 2024 WL 5114663, at *1 (J.P.M.L. 2024). Indeed, any minor differences in factual allegations, claims pleaded, or the nature of asserted works, are immaterial in light of this "common factual core." *See, e.g., In re Marriott*, 363 F. Supp. 3d at 1374; *In re*

*Fisher-Price Rock 'N Play Sleeper Mktg., Sales Prac., and Prod. Liab. Litig.*, 412 F. Supp. 3d 1357, 1359 (J.P.M.L. 2019). The Opposing Plaintiffs neither contest nor engage with this standard under Section 1407.

Moreover, of the approximately six purported distinctions that the Opposing Plaintiffs identify in their briefs, virtually all prove illusory upon brief inspection. ***First***, the News Plaintiffs and California Class Plaintiffs each argue that, "[w]hile the Class Action Cases are focused on training, the News Cases <u>also</u> concern the infringing outputs from various OpenAI and Microsoft products and how the products operate to generate them." MDL Dkt. 57 at 10 (emphasis in original); MDL Dkt. 58 at 15. But while the California Class Plaintiffs have recently made clear that they are not asserting a theory of infringement arising from the LLMs' outputs, they have nevertheless pursued extensive discovery related to both the outputs and how those outputs are generated. For example, they have sought documents relating to OpenAI's LLMs' ability to "output fictional works" or "produce output of 25,000 words or longer" and inquired into OpenAI's efforts to prevent LLMs from "outputting copyrighted material" as well as the "ChatGPT architecture and dataflow as it relates to processing user prompts, including the process that occurs between the issuance of a prompt and the receipt of an output." Ybarra Decl. ¶ 6. The New York Class Plaintiffs have promulgated similar requests, including "[a]ll Documents sufficient to show the output of any" of OpenAI's LLMs, "all prompts inputted into ChatGPT relating to or concerning any of the Class Works…and the output ChatGPT generated in response to each prompt" and OpenAI's methods of "restricting the output of LLMs or ChatGPT" to avoid "copyright infringement." *Id.* ¶ 7. The DMCA Plaintiffs are no different. Raw Story has requested "all chat responses that included any portion of any articles" or that "regurgitated any articles" published the Plaintiffs' websites. *Id.* ¶ 8. Again, the parties' actual emphasis in discovery tells the real and complete story about the facts at issue across the actions, and confirms that each set of plaintiffs views "outputs" as relevant to their claims.

***Second***, the voluminous and admittedly varied nature of the asserted works does not affect the common factual core that favors centralization. The News Plaintiffs argue that the

volume of works asserted in the News Cases and the differences between the asserted works across the cases preclude centralization. MDL Dkt. 57 at 9. Similarly, the California Class Plaintiffs attempt to distinguish *Millette* by mischaracterizing the asserted work in that case as involving "video data" rather than "literary works." MDL Dkt. 58 at 7.[10] But these plaintiffs offer no explanation about why the volume of asserted works alters the core allegations about OpenAI's LLM training practices, or plaintiffs' core theories of infringement. Indeed, this Panel has repeatedly found that copyright actions asserting disparate works "clearly involve common factual issues concerning how [the defendant] allegedly copies and displays" those works. *In re: Am. Home Realty Network, Inc., Multiple Listing Serv. Copyright Infringement Litig.*, 939 F. Supp. 2d 1372, 1373 (J.P.M.L. 2013); *see also In re Gator Corp. Software Trademark & Copyright Litig.*, 259 F. Supp. 2d 1378, 1380 (J.P.M.L. 2003) (cases presented "common, complex legal and factual questions concerning whether the computer advertising network operated by Gator functions in such a way as to constitute trademark and/or copyright infringement" of a variety of asserted works across the cases). Similarly, every case that OpenAI seeks to centralize presents common, complex legal and factual questions involving whether *OpenAI's* alleged use of the works to train its LLMs constitutes copyright infringement or is protected fair use. Plaintiffs do not explain how the volume of asserted works changes the nature of these common questions.

        ***Third***, the News Plaintiffs contend that their claims uniquely allege "additional copying of news content through a process known as 'retrieval augmented generation'" or "RAG." MDL Dkt. 57 at 3. But the issues presented by OpenAI's use of RAG are at best tangential to the News Plaintiffs' claims, as demonstrated by their own discovery emphasis. Of the 95 document requests promulgated by The New York Times on OpenAI, only ***three*** reference RAG. Ybarra Decl. ¶ 9. Of the 76 document requests promulgated by the *Daily News* Plaintiffs, and 64

---

[10] In fact, the *Millette* Plaintiffs allege that text transcriptions of their videos were used to train LLMs. *Millette* Dkt. 47 ¶ 38. Their claims thus relate to text-based LLM training data, just like every other case that OpenAI seeks to centralize. And notably, the *Millette* plaintiffs support centralization.

document requests promulgated by the Center for Investigative Reporting, only **two** reference RAG. *Id.* ¶¶ 10–11. Meanwhile, each of those Plaintiffs have promulgated between 20 and 33 requests referencing LLM training. *Id.* ¶¶ 9–11 Nor is RAG only at issue in the News Cases; the DMCA Plaintiffs have also served requests on this topic. *Id* ¶ 8.

The News Plaintiffs' insistence that their claims uniquely allege that OpenAI "deliberately sought out" their works is also a mirage. Each News complaint alleges that OpenAI trained its LLMs using the publicly available Common Crawl dataset—a "copy of the internet"—in addition to the WebText and WebText2 datasets, which The New York Times describes as "composed of popular outbound links from Reddit." *New York Times*, Dkt. 170 at ¶¶ 26; 87–88 *Daily News* Dkt. 1 at ¶¶ 82–85; *The Center for Investigative Reporting*, Dkt. 88 at ¶¶ 53–54; 70–72. Notably, these same allegations are found in the complaints filed in *Raw Story*, Dkt. 1 at ¶¶ 29–30, *Intercept*, Dkt. 87 at ¶¶ 39–40, and *Authors Guild*, Dkt. 69 at ¶¶ 112–113. All of these plaintiffs—not just the News Plaintiffs—essentially allege that their works were swept up in these massive "cop[ies] of the internet."

**Fourth**, New York Class Plaintiffs contend that the common questions of fact are insufficiently "complex," arguing that "OpenAI relies on the technical complexity of its LLMs…and its intent to rely on a common fair use defense." MDL Dkt. 59 at 18. But OpenAI's LLMs—and the process by which they are trained—*are* tremendously complex, as the New York Class Plaintiffs themselves have alleged. *See Authors Guild* Dkt. 69 ("OpenAI's LLMs are complex mathematical functions comprised of a series of algorithms that break down input text into smaller pieces . . . then translate those pieces into 'vectors,' or a sequence of numbers that is used to identify the token within the series of algorithms"). This complexity goes to the heart of OpenAI's fair use defense. In particular, fair use turns on the "transformative" nature of the challenged use. *See, e.g.*, *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30 (2021). Thus, a key issue impacting the viability of all plaintiffs' claims is whether—and to what extent—OpenAI alleged use of the works to train its LLMs was "transformative." As OpenAI explained in its opening brief, this inquiry requires an understanding of the lengthy process by which LLMs are

trained, the role that training data plays in the creation of LLMs, and how LLMs use that data to generate outputs. MDL Dkt. 1-1 at 12–13. These questions are not only "complex," but legally novel with wide-ranging effects on a burgeoning industry.

*Fifth*, several Opposing Plaintiffs point to the fact that Microsoft is a defendant in some, but not all, of the cases that OpenAI seeks to centralize. But Microsoft itself has filed a brief in support of OpenAI's motion, agreeing that "the elimination of duplication in discovery; the avoidance of conflicting rules and schedules; the reduction of litigation costs; and the conservation of the time and effort of the parties, attorneys, witnesses and courts" all favor centralization. MDL Dkt. 55 at 5. In any event, it is well established law that "[t]ransfer under Section 1407 does not require a complete identity of common factual issues *or parties*." *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014) (centralizing cases with "many non-overlapping defendants").

*Finally*, all four sets of Opposing Plaintiffs insist that the "DMCA cases are distinct from the copyright cases." MDL Dkt. 59 at 17. This attempted distinction is both false and meaningless on its face. First, *the News Cases are DMCA cases*. All three of the News Cases assert claims under 17 U.S.C. § 1202 that are indistinguishable from the Section 1202 claims asserted in *Raw Story* and *Intercept*. The only complaints in this litigation that do *not* assert DMCA claims are the three class actions. And while *Raw Story* and *Intercept* are the only cases that do not plead direct infringement claims, both of these cases effectively raise copyright infringement allegations under the guise of Section 1202 of the DMCA. *See, e.g.*, *Raw Story*, Dkt. 119-1 at ¶ 62 (Proposed Amended Compl.) ("Defendants' actions in downloading thousands of Plaintiffs' articles without permission infringes Plaintiffs' copyright..."). The reason they do not plead infringement claims under Section 501 of the Copyright Act is presumably that none of the DMCA Plaintiffs registered their copyrights, which precludes them from filing suit. 17 U.S.C. § 411. And once again, the discovery that *Raw Story* has sought paints a clear picture of the overlapping factual issues: *every one* of the 13 OpenAI custodians designated in *Raw Story* is also a designated custodian in the News Cases, the New York Class Action, *and* the

California Class Action. Ybarra Decl. ¶ 12. In other words, the OpenAI custodians producing documents in *Raw Story* overlap not only with the News Cases that also assert DMCA claims, but also with the class actions that do not. *Raw Story* has also sought other infringement-related discovery, such as "all documents concerning copyright in the context of AI, including without limitation actual or potential copyright infringement and actual or potential copyright licensing." *Id.* ¶ 8. This extensive overlap in discovery is unsurprising, given the close relationship between the elements of a DMCA claim with traditional copyright infringement. Plaintiffs asserting a claim under Section 1202(b), like *Raw Story* and *Intercept*, must demonstrate that the defendant had "reasonable grounds to know" that removal or alteration of copyright management information "will induce, enable, facilitate, or conceal" copyright infringement. 17 U.S.C. § 1202(b). Thus, any DMCA claim must be accompanied by actual or threatened copyright infringement.

In sum, each of the Opposing Plaintiffs' attempts to draw factual distinctions to defeat centralization between the cases collapses upon even cursory scrutiny.

**B.    Centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.**

**1.    Alternatives to centralization have not succeeded.**

In a discovery dispute filed on December 24, 2024, the California Class Plaintiffs perfectly summarized the current state of deposition coordination across the cases that OpenAI seeks to centralize: "Despite months of best efforts to coordinate depositions across the SDNY and ND Cal cases, those efforts have not borne fruit." *In re ChatGPT*, Dkt. 244 at 2. To be clear, these are not OpenAI's words. Rather, this is how the California Class Plaintiffs describe the status of deposition coordination efforts when not addressing this Panel. And yet, just 10 days after making this representation in the Northern District of California, the California Class Plaintiffs insist to this Panel that "[c]oordination between the parties is not only feasible but underway" and "the best alternative [to centralization] is cooperation among counsel, which is already happening." MDL Dkt. 58 at 12, 2. The News Plaintiffs, New York Class Plaintiffs, and

the DMCA Plaintiffs all raise similar arguments, insisting that "the parties are already working together to coordinate, either by agreement or court order." MDL Dkt. 57 at 13; MDL Dkt. 59 at 10 ("Setting aside the recently filed DMCA and *Millette* cases, coordination between the balance of proceedings is ongoing and entirely practicable"); MDL Dkt. 51 at 10 ("there could be informal coordination both between the DMCA Cases themselves and with the Consolidated News Cases."). As of the date of this filing, and as recent as January 9, 2025, plaintiffs have rejected multiple proposals by OpenAI to coordinate depositions across cases.

In fact, to the extent that there has been *any* informal discovery coordination, it has been a one-way street, with OpenAI agreeing to extensive cross-production of documents and plaintiffs offering no reasonable proposals on deposition coordination. To be clear: plaintiffs are wrong that they are automatically entitled to blanket cross-production of documents from other similar cases. Even among actions centralized under Section 1407, plaintiffs "are not entitled to complete access to [another] [p]roduction simply because there may be overlap between their claims." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4680242, at *2 (N.D. Cal. Oct. 18, 2017). Nevertheless, OpenAI has come very close to complete cross-production of its documents.

For example, in addition to the dozens of custodians already designated in several cases—34 in the News Cases, 24 in the New York Class Action, and 27 in the California Class Action—OpenAI has agreed to cross-produce documents from five custodians in various cases in which they are not formally designated and is engaged in ongoing discussions about further additions to this list. Ybarra Decl. ¶ 13–15. As a result, the overwhelming majority of OpenAI's custodians will have their documents produced across multiple cases. To illustrate: of the 85,893 documents that OpenAI has produced across all of the cases that OpenAI seeks to centralize, 79,159 of those documents—***over 92%***—have been produced in both the California and New York Class Actions; and 77,383 of those documents—***over 90%***—have been produced in both the California and New York Class Actions ***as well as*** all of the News Cases. *Id.* ¶ 16. Given

11

these statistics, plaintiffs' protestations that they don't have **enough documents** from the other cases to coordinate depositions rings hollow. MDL Dkt. 58 at 12.

As the foregoing makes clear, and as the California Class Plaintiffs agree, informal coordination has not "borne fruit" despite the parties' "best efforts."  Neither have the parties' attempts to obtain court-ordered discovery coordination. The News Plaintiffs insist that "the parties are working on coordination protocols, and the remaining disputes will likely be addressed by Judge Wang on January 22, 2025." MDL Dkt. 57 at 14. But that is far from clear. Judge Wang has denied the parties' request for entry of a deposition protocol as premature not once but *twice*, most recently on December 3, 2024. *New York Times*, Dkt. 359. And although her latest order encouraged the parties to continue conferring and permitted the parties to renew their motion for a deposition protocol "in 2025," *id.*, those conferrals have not meaningfully narrowed the parties' disputes. Judge Wang has also already ruled that she will not order coordination between cases pending in the Northern District of California and those pending in the Southern District of New York, as detailed in OpenAI's opening brief. MDL Dkt. 1-1 at 11. Judge Martínez-Olguín in the Northern District of California has similarly expressed reluctance to order deposition coordination across cases pending in different districts. MDL Dkt. 59-1 at 11. Meanwhile, uncoordinated discovery continues to progress, and depositions will begin in the coming weeks. The parties cannot continue to wait with the hope that the plaintiffs in all matters will reverse course and agree to meaningful discovery coordination.

In any event, the lack of meaningful discovery coordination speaks clearly to one thing: the need for centralization. In *In re Gator Corp. Software Trademark & Copyright Litig.*, this Panel "appl[au]ded every cooperative effort undertaken by parties to any litigation" but concluded that Section 1407 centralization was preferable to informal coordination due its "salutary effect of placing all actions in this docket before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues …; and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the

overall benefit of the parties." *In re Gator Corp. Software Trademark & Copyright Litig.*, 259 F. Supp. 2d 1378, 1380 (J.P.M.L. 2003). The same is true here. The parties' and the courts' considerable efforts to achieve deposition and other discovery coordination across two districts and five judges are commendable, but have reached their limits.

### 2.    Centralization will avoid inconsistent rulings.

No Opposing Plaintiff seriously disputes that there is a risk of inconsistent rulings absent centralization. Indeed, they cannot even firmly dispute with any specificity the clearest example of such an inconsistent ruling—Judge McMahon's and Judge Rakoff's divergent opinions on DMCA Article III standing in the *Raw Story* and *Intercept* cases, respectively.

The DMCA and News Plaintiffs contend that Judge McMahon's and Judge Rakoff's divergent outcomes on identical questions of Article III standing are "likely" attributable to differences in Raw Story and Intercept's respective complaints. MDL Dkt. 51 at 12; MDL Dkt. 57 at 16–17. But, despite labeling the Raw Story and Intercept complaints "materially different," they fail to identify a single purported difference that is "material" to the DMCA standing inquiry. MDL Dkt. 51 at 12. Instead, in a heavily qualified and carefully worded response, DMCA Plaintiffs offer only the possibility that the divergent rulings "*likely* reflect differences in the operative allegations, not inconsistencies in the court's application of the law." *Id.* (italics added). Judge Rakoff has not yet issued a full opinion explaining his ruling, but the irrefutable point is that these are two near-identical cases filed by the same law firm, on the same day, that—for reasons never given—were not related to one another. As a result, these near-identical cases have been subject to divergent rulings on the merits, case management, and scheduling, creating unnecessary burdens and complicating efforts at informal coordination.

Further—and remarkably—not a single Opposing Plaintiff even attempted to explain how overlapping or conflicting class certification rulings can be avoided without centralization. Of course, this is because such an outcome **cannot** be avoided absent centralization. As OpenAI explained in its opening brief, the risk of inconsistent decisions applying to the same members of

overlapping classes is among the most compelling reasons to order centralization. *In re Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L. 1970) (The "potential for conflicting or overlapping class actions presents one of the strongest reasons for [centralizing] such related actions."); *In re Republic Nat'l-Realty Equities Sec. Litig*., 382 F. Supp. 1403, 1406 (J.P.M.L. 1974) ("[I]t is necessary to have all class action questions resolved by a single judge."). The Opposing Plaintiffs do not even attempt to deny the serious risk of inconsistent class rulings. The actions should be centralized to avoid this risk.

### 3.    The time for centralization is now.

Several sets of Opposing Plaintiffs present confusing and contradictory arguments that OpenAI's motion to centralize is both premature—arguing that more time is needed to allow for informal coordination of discovery—and too late—arguing that OpenAI should have filed this motion before half of the pending cases were even filed and before plaintiffs had proven themselves incapable of informal discovery coordination. *See, e.g.,* MDL Dkt. 57 at 2 ("The parties' work to coordinate depositions continues"), 15 ("OpenAI waited too long to file this Motion").

Setting aside the deeply contradictory nature of these arguments, OpenAI's motion is neither premature nor late, but appropriately timed. The majority of the cases that OpenAI seeks to centralize are in nearly identical procedural postures. Fact discovery is currently scheduled to close in the California Class Action on April 28, 2025, and in the three News Cases and the New York Class Action on April 30, 2025—just two days later. As of the date of this filing, at least some depositions are likely to begin within the month, but none have been taken in any case. While discovery had been stayed in the *Intercept* action, that case is likely to quickly catch up with the other cases in light of OpenAI's agreement to cross-produce all documents produced in *Raw Story*, the other DMCA-only case. Indeed, the DMCA Plaintiffs argue that *Intercept* is likely to be on a *faster* timeline than the other cases due to Judge Rakoff's five-month default time-to-trial practices. MDL Dkt. 51 at 8. And while discovery remains stayed in *Millette*, that

case is in no different a procedural posture than many tag-along cases that join an MDL after centralization has been ordered. The *Millette* Plaintiffs, moreover, support the centralization of their case.

And contrary to the DMCA Plaintiffs' argument that centralization will "grant OpenAI no relief" because the duplicative discovery will have been completed by the time this motion is heard, MDL Dkt. 51 at 9, there are many efficiencies still to be gained from centralization. First, even if fact discovery is completed by the end of April 2025, there is still considerable value in coordinating expert discovery across the actions. These are expert-heavy cases. The California Class Plaintiffs have disclosed *10* experts and consultants; The New York Times has disclosed *23* experts; and the *Daily New*s Plaintiffs have disclosed *14* experts (11 of which were also disclosed by The New York Times). OpenAI also expects to present several experts who will opine on complex questions in the copyright cases, including on the transformative nature of LLM training, the lack of market harm to copyright holders, and the absence of any viable theory of damages. Duplicative depositions of experts would be just as burdensome, expensive, and unnecessary as duplicative depositions of fact witnesses. Thus, even if fact discovery is largely complete by the time centralization is ordered, there will be plenty of time to coordinate otherwise duplicative expert discovery.

Further, while the parties are preparing to begin depositions later this month, it is far from clear that depositions in the News Cases, the New York Class Action, and the California Class Action can all be completed by the end of April in light of the extraordinary demands from plaintiffs. As just one example, the California Class Plaintiffs recently filed a request with Magistrate Judge Illman seeking 280 hours of deposition of OpenAI's fact witnesses, including 30 hours of Rule 30(b)(6) testimony. *In re ChatGPT*, Dkt.244 at 3–4. To complete 280 deposition hours before the close of fact discovery in the California Class Action, OpenAI would need to present its witnesses for approximately 18.6 hours of deposition per week for the next 15 consecutive weeks—and that is *just one case*. The News Plaintiffs and New York Class Action Plaintiffs have made similarly outrageous proposals, potentially tripling the number of

depositions that must occur before the end of April. Absent significant coordination among the plaintiffs and reasonable time limits on the depositions of OpenAI witnesses—whether stipulated or court-imposed—it is doubtful that the volume of depositions that plaintiffs seek can be completed on the current schedule. An order centralizing these cases at any point before discovery has actually been completed will benefit the parties and witnesses by facilitating the coordination of whatever discovery remains.

And these are just the efficiencies gained in discovery. At this stage in the litigation, no motion for summary judgment or for class certification has been filed. Each of these decisions will benefit from being heard and ruled on by a single judge who has become familiar not only with the legal principles specific to copyright and fair use, but also with the highly complex technology at issue.

C.    **The Class Plaintiffs' procedural history arguments are legally irrelevant and factually inaccurate.**

The California Class Plaintiffs dedicate the majority of their brief not to any well-founded argument against centralization, but to misrepresenting the procedural history of this litigation in an attempt to blame its current uncoordinated state on OpenAI. MDL Dkt. 58 at 11. But the California Class Plaintiffs' recitation of the early procedural history of this case—while inaccurate in many ways—serves primarily to show that those Plaintiffs have long recognized the extensive legal and factual overlap between, at a minimum, the Class Actions and News Cases. *See Authors Guild*, Dkt. 71-1 at 1 (California Class Plaintiffs' "first-to-file motion" describing the S.D.N.Y actions as "copycat cases."). While blame-shifting has no relevance to a Section 1407 analysis, OpenAI responds briefly to correct the record.

*First*, the California Class Plaintiffs state the OpenAI "opposed" their "first-to-file motion." MDL Dkt. 58 at 1. This is a blatant falsehood. What OpenAI opposed was the California Class Plaintiffs' motion to *enjoin OpenAI from defending itself in the New York Times and New York Class Actions*—drastic relief that was swiftly rejected by Judge Martínez-Olguín on the grounds that "Plaintiffs have pointed to no authority allowing the Court to enjoin

Defendants from defending against litigation in a second district court case." *In re ChatGPT* at Dkts. 111, 118. As to the California Class Plaintiffs' "first-to-file motion"—actually styled a "Motion to Intervene and Dismiss, Stay, or Transfer"—which was filed in the New York Class Action and *The New York Times*,[11] OpenAI took no position. *Authors' Guild*, Dkt. 80. **Second**, the California Class Plaintiffs state that OpenAI's concerns about the lack of coordination among the cases are "of their own making" because OpenAI failed to join the California Class Plaintiffs' earlier calls for consolidation. MDL Dkt. 58 at 11. But Plaintiffs ignore that their efforts to prevent *The New York Times* and the New York Class Action from proceeding in the Southern District of New York were forcefully rejected by not one but **two district court judges**. Judge Stein, like Judge Martínez-Olguín, swiftly denied the California Class Plaintiffs' first-to-file motion on numerous grounds, concluding that they could not intervene as of right and denying permissive intervention. *Authors Guild*, Dkt. 100 at 6. Moreover, it was perfectly appropriate for OpenAI to abstain from a dispute that was, at its core, between two groups of plaintiffs' attorneys jockeying for position as lead counsel in overlapping putative class actions.

As OpenAI explained in its opening brief, it made the considered decision in January 2024 not to join or file a motion to transfer the only two actions then pending in the Southern District of New York, and to instead pursue informal coordination, while reserving the right to seek centralization under Section 1407 if more similar cases were filed. MDL Dkt. 1-1 at 18. This decision was not only reasonable but is the very course of action that this Panel frequently calls for. For example, in *In re: Am. Home Realty Network, Inc., Multiple Listing Serv. Copyright Infringement Litig.*, this Panel denied a motion to centralize two actions despite the presence of "common factual and legal issues" in favor of voluntary coordination "in light of the low number of actions." 939 F. Supp. 2d 1372, 1373 (J.P.M.L. 2013). However, the Panel expressly advised that the defendant should renew its motion "[i]n the event that additional related actions are filed, or voluntary coordination is unsuccessful." *Id. See also In re: Glaceau VitaminWater Mktg. &*

---

[11] At that time, these were the only copyright cases filed against OpenAI in the Southern District of New York.

*Sales Prac. Litig. (No. II)*, 764 F. Supp. 2d 1349, 1350 (J.P.M.L. 2011) (granting renewed motion to centralize after more cases were filed, which undermined prior agreement to voluntarily coordinate).

Finally, the New York Class Plaintiffs—and only the New York Class Plaintiffs—argue that OpenAI *cannot* seek centralization under the January 22, 2024 stipulation in that case. MDL Dkt. 59 at 7. In that stipulation, OpenAI memorialized its agreement not to transfer the two then-pending S.D.N.Y actions while "reserv[ing] the right to file a motion under 28 U.S.C. § 1407 seeking coordination or consolidation before any appropriate district court" if "additional cases are filed raising similar claims on behalf of individual plaintiffs or proposed classes that overlap, either partially or completely" with the proposed classes in the New York Class Action. *Authors Guild* Dkt. 56. The New York Class Plaintiffs argue that the subsequent filing of the *Raw Story*, *Intercept*, *Daily News*, and *The Center for Investigative Reporting* cases do not constitute "additional cases…raising similar claims." MDL Dkt. 59 at 7. This argument is facially absurd. *First*, the New York Class Plaintiffs argue that the *Daily News* and *The Center for Investigative Reporting* do not satisfy the criteria because they were consolidated with *The New York Times*. But the stipulation makes no exception for consolidation; it is concerned only with the filing of cases asserting similar claims, which those cases undisputedly do.

*Second*, the New York Class Plaintiffs argue that the *Raw Story* and *Intercept* cases do not raise "similar claims." But as explained above, the *Raw Story* and *Intercept* DMCA claims and allegations are, in effect, copyright infringement allegations pleaded as DMCA claims because the asserted works were not registered and are thus not eligible for an infringement lawsuit under the Copyright Act. *See supra* pg. 9–10. However styled, the DMCA Plaintiffs' claims go to the same underlying conduct—OpenAI's alleged training on copyrighted works—as all other actions. Their "differing legal theories [are] not significant" to the Section 1407 analysis. *In re Marriott,* 363 F. Supp. 3d at 1374. **Finally**, the New York Class Plaintiffs argue that *Raw Story* and *Intercept* do not count as "additional cases" under the stipulation criteria because the *Raw Story* and *Intercept* plaintiffs do not fall within the proposed New York Classes,

which include only book authors. But this is a tortured reading of the stipulation, which plainly permits a Section 1407 motion in the event that "additional cases are filed raising similar claims on behalf of individual plaintiffs"—not just overlapping classes. *Authors Guild*, Dkt. 56 at ¶ 1.

> **D.     The cases should be centralized in the Northern District of California.**

The *Millette* and California Class Plaintiffs both agree that, should centralization be ordered, the Northern District of California is the most appropriate transferee court. The California Class Plaintiffs in particular point to OpenAI's principal place of business in Northern California, Microsoft's substantial presence there, and the Northern District of California's extensive MDL experience. MDL Dkt. 58 at 18. And even Microsoft, which is not a defendant in any case filed in the Northern District of California, does not oppose transfer there, so long as the assigned judge has prior MDL experience.[12] MDL Dkt. 55 at 8.

No plaintiff contests that the alleged conduct underlying their claims overwhelmingly took place in the Northern District of California, or that the majority of fact witnesses are located there. Nor does any plaintiff challenge the Northern District of California's proven track record for efficient case management, or the statistics demonstrating that dispositive motions are resolved in less than half the time in the Northern District of California than they are in the Southern District of New York. MDL Dkt. 1-1 at 20.

Rather, the News Cases and New York Class Action Plaintiffs primarily argue that they prefer the Southern District of New York because their own cases were filed there, and because Judge Wang has undertaken considerable efforts to familiarize herself with and manage the cases assigned to her. MDL Dkt. 57 at 18; MDL Dkt. 59 at 19–20.[13] Since the News Cases and New York Class Action were referred to Judge Wang for all non-dispositive pre-trial matters on

---

[12] OpenAI agrees that a judge with prior MDL experience would be best suited for this complex litigation but does not otherwise request a specific judicial assignment.

[13] The DMCA Plaintiffs also express a preference for the Southern District of New York, but based on the assumption that the DMCA cases would be consolidated only with the News Cases, which are in the Southern District of New York. Dkt. 51 at 13. The DMCA Plaintiffs' brief does not express a view on the appropriate transferee forum for centralization of *all* cases in OpenAI's Schedule A.

August 6, 2024, she has undoubtedly undertaken significant efforts to manage those cases and to resolve long-pending disputes. However, Judge Wang's investments in these cases will not be lost upon transfer to the Northern District of California; transferee judges always benefit from the effective case management of the presiding judges prior to centralization. And much more work remains for the transferee judge—including, in particular, summary judgment and class certification motions.

As OpenAI argued in its opening motion, both courts are highly capable, but the Northern District of California's case management track record, considerable MDL experience, and convenient location for the majority of witnesses make it the most appropriate transferee forum.

## III.    CONCLUSION

For the reasons given above, OpenAI requests that this Panel order that the cases in Schedule A be centralized and transferred to a single judge in the Northern District of California pursuant to 28 U.S.C. § 1407.

2848874

Respectfully submitted,

Dated: January 10, 2025

KEKER, VAN NEST & PETERS LLP

By: */s/ Michelle S. Ybarra*
ROBERT A. VAN NEST
RVanNest@keker.com
R. JAMES SLAUGHTER
RSlaughter@keker.com
PAVEN MALHOTRA
PMalhotra@keker.com
MICHELLE S. YBARRA
MYbarra@keker.com
NICHOLAS S. GOLDBERG
NGoldberg@keker.com
THOMAS E. GORMAN
TGorman@keker.com
KATIE LYNN JOYCE
KJoyce@keker.com
CHRISTOPHER S. SUN
CSun@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, California 94111-1809
Telephone:     (415) 391-5400
Facsimile:      (415) 397-7188

1

Dated:  January 10, 2025                            MORRISON & FOERSTER LLP


By: */s/ Tiffany Cheung*
JOSEPH C. GRATZ
JGratz@mofo.com
TIFFANY CHEUNG
TCheung@mofo.com
VERA RANIERI
VRanieri@mofo.com
JOYCE C. LI
JoyceLi@mofo.com
MELODY E. WONG
MelodyWong@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:     (415) 268-7000
Facsimile:     (415) 268-7522

ROSE S. LEE
RoseLee@mofo.com
ALEXANDRA M. WARD
AlexandraWard@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone:    (213) 892-5200
Facsimile:    (213) 892-5454

CAROLYN M. HOMER
cmhomer@mofo.com
MORRISON & FOERSTER LLP
2100 L Street, NW
Suite 900
Washington, DC 2003
Telephone: 202-65004597

JOHN R. LANHAM
jlanham@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Dr.
Suite 100
San Diego, CA 921320
Telephone 858-720-5100

2

MAX I. LEVY
MLevy@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:    (650) 813-5600

ERIC K. NIKOLAIDES (*pro hac vice*)
ENikolaides@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Telephone:    (212) 468-8000

2848874

Dated:  January 10, 2025                LATHAM & WATKINS LLP


By: */s/ Elana Nightingale Dawson*
ANDREW M. GASS
Andrew.Gass@lw.com
JOSEPH R. WETZEL
Joe.Wetzel@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:    (415) 391-0600

SARANG VIJAY DAMLE (*pro hac vice*)
Sy.Damle@lw.com
ELANA NIGHTINGALE DAWSON (*pro hac vice*)
Elana.nightingaledawson@lw.com
MICHAEL A. DAVID (*pro hac vice*)
michael.david@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone:    (202) 637-2200

ALLISON L. STILLMAN (*pro hac vice*)
Alli.Stillman@lw.com
RACHEL R. BLITZER (*pro hac vice*)
Rachel.blitzer@lw.com
HERMAN H. YUE (*pro hac vice*)
Herman.yue@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone:    (212) 751-4864

*Attorneys for Defendants*
OPENAI, INC., OPENAI, L.P., OPENAI
OPCO, L.L.C., OPENAI GP, L.L.C.,
OPENAI STARTUP FUND GP I, L.L.C.,
OPENAI STARTUP FUND I, L.P., AND
OPENAI STARTUP FUND
MANAGEMENT, LLC, OPENAI LLC,
OPENAI GLOBAL L.L.C., OAI
CORPORATION L.L.C., and OPENAI
HOLDINGS LLC

4